

**U.S. Department of Justice**

*United States Attorney*
*District of Maine*

*100 Middle Street*  (207) 780-3257
*6th Floor, East Tower*  TTY (207) 780-3060
*Portland, ME 04101*  Fax (207) 780-3304
  www.usdoj.gov/usao/me

November 28, 2025

Honorable Karen Frink Wolf
U.S. Magistrate Judge
U.S. District Court, District of Maine
Edward T. Gignoux U.S. Courthouse
156 Federal Street
Portland, ME 04101

    Re:    *United States v. Kevin Bell,* No. 2:25-mj-00125-KFW

Dear Magistrate Judge Wolf:

    The government writes in response to the Court's inquiry during the parties' Zoom conference with the Court on November 26, 2025, in the above-referenced matter.

    Question 2 of the draft jury questionnaire included the statement, "You may hear evidence that the Defendant has been diagnosed with autism, anxiety, and depression." During argument regarding the draft questionnaire, the parties referenced statements by the defendant that they believed may come before the jury regarding his purported mental health diagnoses. There was discussion as to whether the defendant's statements referred to anxiety, depression, and autism or to diagnoses of the same. The Court directed the government to identify the defendant's statements for the Court's consideration in modifying Question 2.

    The government noted that it intends to introduce in evidence statements the defendant made in two encounters with law enforcement in April 2025. The defendant's first encounter was on April 5, 2025, with Kenneth Tabor, an Investigator from the Maine Office of the State Fire Marshal. The first part of that encounter was not recorded, but the second part of the encounter was audio recorded.

**Government Exhibit A**
**2:25-cr-76-JAW**

With regard to the unrecorded portion of the April 5, 2025 encounter, the government anticipates that Kenneth Tabor will testify that the defendant made statements including the following, among others. These statements are not direct quotes.

- He has been in trouble with law enforcement in the past and was recently detained and taken to the hospital for an involuntary evaluation by Bridgton PD.

- He has been diagnosed as being "on the spectrum" and he's supposed to see someone, clinically, to talk about his statement and ideations but has yet to do so.

With regard to the recorded portion of the April 5, 2025 encounter, the government anticipates that, if the full, unredacted audio recording is entered in evidence, the jury would hear the following statements, among others.

- "Well, yeah, it took me longer because I would get scared and, um, not practice and, and um, and, and that it's, isn't it funny that I that been diagnosed with, uh, an anxiety disorder, whereas you can put me in a plane by myself and I engine could die and I'm trained to handle that."

The defendant's second encounter was on April 7, 2025, with Chief Jones of the Bridgton Police Department. That encounter was video recorded. The government anticipates that, if the full, unredacted video recording is entered in evidence, the jury would hear the statements excerpted below, among others.

- Defendant: "And, um, I'm willing to, to give you the password to my computer to try to expedite this because, um, you've taken away, um, all of my, my contact with outside world. I have, I need to talk to my lawyers. I need to talk to my, my, uh, my therapist. And if my bank accounts, like, if I go to the library and use their computer, I can't get into it without my, my phone with the two factor authentication. And I might run out money, my, my bank accounts to, to, uh, move money. Um, I, I can't even go to Walmart and get another laptop. I mean, this, this is the only things that I are causing me, uh, pain is I can't, I, I need my phone at least. Can you just expedite like I, you know, do a backup. I mean, do, do this as soon as possible and I'll give you the passwords to my computers to make that easier for you.

- Defendant: Mm-hmm. Well, I, I deny, um, I was telling him like about, you know, my recent, uh, you know, suicidal threats and all of that stuff, um, it was a bad idea. Um, I just wanted to like, you know, get his perspective on it, telling him that, like I'm done doing all that stuff. And, um, I did not threaten the president. Okay. I think he's putting words in my mouth and he's twisting it. Or maybe I was just, I don't know, mentally ill or

something. Um, because I, I did not, I did not threaten anybody. I was just telling them about the, the, like the recent events, you know, that my recent con—uh, encounters with the police. I did not threaten anybody.

- Defendant: Um, I was telling him like, you know, like I've been, you know, in, in like in the police car for the first time in my life, like in the last three months. Um, you know, I guess I was like being stupid and like testing law enforcement and all of that. I, um, as far as, uh, Trump goes, uh, I was saying like there's, uh, you know, crazy people, uh, who shot the United Healthcare, CEO and, and, uh, Trump rally, um, last year, you know, that's, that's fact. That's, that's on CNN. Um, I did not say that I have any desire to, uh, to harm the president. I deny that. Is it. And I wanna know if, is that the specific, the what? The what, what dangerous weapons was I, was I using, I was in a diner with lots of people there. I was, I was kind of calm and eating my food. And there were the, the, uh, staff at the diner, if they saw, I was like acting out. I mean, they could, they could have like asked me to leave. I, I don't think I, I said I, uh, was like in a, in a, in a rage or anything, or that I was, um, I was just like, I shouldn't have yeah told the Police officer like that, you know? I mean, if I told like a, like the, another stranger, like, and say uhhuh, you know. But, um, uh, yeah, I think, um, uh, because of the, the prior contact with me<u>, I feel like you, um, like you, you, you getting, you, you, you sent me taking Kevin to, like Maine Med, like twice</u> and we wanna teach him a lesson now, you know, like, you're being really, really hard on me. And, and, and, uh, you've got some other vendettas about past things that I've said, you know, that you've investigated and you've (U/I) me of. And I just wanna know, is this about the, uh, incident like a month ago with the, the 988 call? Has it got anything to do with that?

- Defendant:  Um, I was, I was uh calling the 988 crisis line, and I was like really angry and, uh, you know, um, <u>made some threats against my, a psychiatrist and they took me to Maine Med.</u> And that was. The Sanford police were involved in that.

    Jones:  The time where you threatened to kill, uh, medical (U/I)?

    Defendant:    Yeah.

    Jones:   Okay. Uh, I believe I remember the Sanford police working with us on that. <u>We took you to Maine Medical Center.</u>

    Defendant:    Yeah. So am I cleared of that?

    Jones: Well, I, I dunno, that's a mental health matter.

<u>Defendant</u>:   Yeah.

<u>Jones</u>:  It's a mental health matter.

<u>Defendant</u>:   Exactly. Yes.

- <u>Defendant</u>:  Um, like I was, uh, talking about like, uh, people who are like, you know, really disturbed and, um, you know, uh, because I know I'm disturbed, but maybe some, some people who are like recently, like the United Healthcare, uh, that Luigi Mangione, um, and the, the, you know, the last July, the guy, you know, at the Trump rally. Um, so those people are really <laugh> in serious trouble. And, you know, um. Actually, the one at the rally got shot dead, anyway. Um. I did not say anything that I have any inclination or desire to harm the president. It's not true. It's kind of, maybe in the conversation, like, you know, the from how it started, it it seemed to, uh, some bias, some bias there. But, uh, but it was wrong. I did not say, um, that I want to hurt Trump. I was talking about the fact that, so it's something, uh, that everyone knows about in the news. And, um, that's free speech.

    <u>Jones</u>: You mentioned that you might, you might have been mentally ill. Those are your words. What did you mean by that?

    <u>Defendant</u>:  I've been having a lot of, uh, anxiety and depression and, um, even to a point where like (U/I) pains in my head and I'm seeing a, gonna see a, uh, a therapist, uh, on Wednesday. And I need to know that I need to log on to get the address and hopefully the, I dunno, can you look it up for me? The address? Uh, so yeah, I do have a lot of mental health problems. Okay. <u>And, and I've been diagnosed with autism spectrum disorder.</u>

    <u>Jones</u>:  Um, um, but, but you said specifically, and I'm just trying to understand, like I said, you can get up and leave whenever you'd like, but the, uh, you said in the conversation you said maybe I was mentally ill or something.

    <u>Defendant</u>:  Yeah.

    <u>Jones</u>:  So that tells me that you are concerned about words that you said.

    <u>Defendant</u>:  Um, yeah, the whole conversation. That that's maybe I, I, uh, saying things that were not what I really meant, or, um.

    <u>Jones:</u>  What kind of things did you say that you don't think you really meant?

Defendant:    Um, like talking about the, the, the, the Trump shooter in that context, you know, of like my recent, you know, police encounters. Um, I, um, so, so maybe, I guess part of the, the, yeah, so, so maybe I was saying things in kind of a distorted way that my conversation was as a whole, like, you know, kind of disturbing, but, and I was saying things that, you know, um, you know, bringing up topics that were kind of like, oh, well, why'd you bring that up in this conversation? Is, is, um, also kind of disturbing. So. I did not, I deny threat threatening President Trump. I do not have any weapons, um, as, as you've seen in my, from my social, my residence. Um, and you'll find in, in, when you, if you search my computer that there's just nothing, um, you know, uh, that nothing disturbing that would think that I'm gonna do anything like that. Um, I, I, uh, I hope that you can see this in the context of like my autism spectrum disorder. Okay. I have a mental disability.

Jones:   Well, I, I have a lot of respect for, for autism. I've been trained, especially, uh, regarding autism for at least the last 20 years, I've been a therapeutic foster parent. Uh, and I have a lot of understanding about how the spectrum, uh, works, how people, people, uh, on the spectrum communicate. So, so I do have a very in depth understanding of that. Um, but you, but you can understand a little bit of, of what I'm, you know, concern.

Defendant:    [voices overlap]

Jones:  Yeah. So, I mean, even in this conversation right now, Kevin, you mentioned in February you threatened to kill a medical worker, right? I mean, you threatened to kill yourself.

Defendant:  Yeah.

Jones:  So, you know, it's one thing if you had never, never made any inclination about ending somebody's life or un-aliving them, but, but that's kind of happened, right?

Defendant:  Yeah.

Jones:   Fair to say, fair to say?

Defendant:  Mm-hmm <affirmative>.

Jones:   So, so, yeah.

Defendant: And, and, okay. And you know what? Um, I think going to jail is not gonna help me. I need to get, I'm going into therapy soon, that's gonna help me. Okay? I'd rather be like court ordered to, to see a therapist,

to see a, a, a mental health worker, um, than to, you know, going to jail's gonna mess, fuck me up even more.

Jones: I think part part of that Kevin, though, is, is figuring out levels of honesty and transparency, and whether or not we're talking about, like, trying to brush a comment under the rug. Like, well, you know, if somebody's, if I'm just telling you, telling you the way I, I see things, and I've done this job a little, a little while. I mean, we've talked about just now, you and I have talked about at least two or three times where you did threaten to kill either you, yourself, or somebody else. And you made those.

Defendant: I did, yeah.

Jones: You made, you made those comments. And then we fast forward to this, this conversation you had, you know, at wherever it was. Where was it? Um, where was this conversation?

Defendant: It was Morning Glory Diner.

Jones: Okay. So, so you, you had a conversation there, I guess, and like I said, you don't have to talk to me, but I'm just trying to figure this out, and if someone needs help, I wanna see them get help. But, you know, you're talking about these other times clearly, definitively you've made threats against your own life and the life of these other people. But then we fast forward to, to this instance, and that was just a misunderstanding. And I mean, but, but you just understand where, where I'm coming from, I recognize patterns and facts.

Defendant: Yeah. There is a pattern here.

Jones: So, so.

Defendant: And I need help. I need help with the, I need counseling and, and mental health support in general.

- Defendant: I, I, I, I was saying that, uh, that that there, that there were, uh, uh, you know, guys out there or even like, really like, ruined their lives, like, or really, um, done stupid stuff like this, United Healthcare, CEO, and, uh, this, uh, guy in, in Butler, Pennsylvania. Um.

Jones: But why would you, why would you...

Defendant: I drew a comparison, I don't know.

Jones: But, but why would you need mental health help for that? What they did? That doesn't seem to be what you and I were just talking about.

Defendant: Okay. So.

Jones: What, what, what is it that you're saying you need mental health help for, instead of incarceration? If you, something you said raised a red flag.

Defendant: Yeah.

Jones: And what you are saying to me is, I don't need to go to jail for that. I need help for that. Right. You just, you're saying stuff that doesn't, it seems like there's something that you're avoiding. And I wasn't there. I can't help you if you don't tell me what happened.

Defendant: I, I, I'm, I'm trying to, yeah. So, so that was the, the, uh, um.

Jones: I can't do, I can't do anything. But I can at least understand. So what, well, what are we talking about?

Defendant: Um, we are talking about like, um, I I, if I made threats, it was, it was against, was, yeah. If, if I made threats, did I make threats in general to, uh, the public? Or did I make threats towards a specific person?

Jones: What were the threatening words? What, I dunno what

Defendant: I don't. And then that's why I don't, I don't know what the, what the, the threatening words were. I did not say, I'm gonna do this to this person. I did not, I deny saying that.

Jones: But what did you say?

Defendant: I was talking about someone else in the news.

Jones: You didn't say anything about you?

Defendant: No.

Jones: Then why would you need mental health help?

Defendant: Okay. Not. Okay. Well, never, never mind mental health. But it was twisted and twisting my words into like, drawing conclusions about that, that I'm going to, that I said I'm gonna be that person, like, like that, or, um, I'm gonna do something like that. It was, uh, I never said that it was kind of like a, a b equals, you know, c kind of decision about that inference.

Page **7** of **9**

- Jones:  Some of the things that concern me though, Kevin, are what you're saying about how you were, you don't know what you said, maybe you were mentally ill. You kind of, you kind of threw that out there.

    Defendant:  [voices overlap] Yeah. Yeah. Yeah. <u>Because of Autism</u>. Yes.

    Jones:  And then you said yes. And then you said, I don't need to go to jail. That's not gonna fix this. That's not gonna help this. You said, I need help.

    Defendant:  Yes.

    Jones:  Now, now I'm a student of language. I understand people, I understand the spectrum. I understand the very fine parameters that you live within being, being on the spectrum. I understand all of that very, very well.

    Defendant:  Yeah.

    Jones:  And so when you say those things to me, Kevin, here's what I understand. Here's what I understand. Right? That in the course of our discussion today and your relating of those events, it sounds like you have a very accurate depiction of most of the timeline. Something was said or done by you, that you feel was misunderstood. Not not what we've already talked about. There's something else that you might have said or done. I don't know, because you haven't mentioned it.

    Defendant:  But yes, I'd like to know what that is.

    Jones:   But, but, but I'd like to know what it is, because I think you know. I think you know because you've alluded to it, you said you that because you talked about something that needs to be fixed. You've talked about how you need help. You've talked about how maybe you were mentally ill at that time. And so, Kevin, Kevin, I can't, like I said, you can get up and leave whenever you want, but what I'm telling you is I'm sitting across the table from someone who is being transparent about some things, about whatever happened. But what I'm telling you, and I'm, I'm not, uh, I don't have a good poker face. I don't, I don't hide things well, but I think

In the recent Zoom conference, the government also indicated it would confirm the towns of residence of potential witnesses Olivia Parke, Justin Gibbons, and Bayleigh Young. The witnesses reside in Denmark, Bridgton, and Hebron, respectively.

Please let the parties know if you have any questions or require additional information. Thank you for your time and attention to this matter.

            Sincerely,

            ANDREW B. BENSON
            UNITED STATES ATTORNEY

      BY: */s/ Nicholas Heimbach*
            Nicholas Heimbach
            Assistant United States Attorney

Cc: Caleigh Milton, Esq.
  Grainne Dunne, Esq.