## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA

v.

KEVIN BELL

No. 2:25-cr-00076-JAW

### GOVERNMENT'S TRIAL BRIEF

## I.  STATUS OF THE CASE

A.  Jury selection was completed on December 1, 2025.

B.  Trial is scheduled to occur from December 16, 2025, to December 18, 2025.

C.  The government expects to call as many as ten witnesses in its case-in-chief.

D.  The government anticipates that its evidence will take approximately one-and-a-half days to present. At most, the government anticipates its evidence will take two days to present.

E.  Motions in limine must be filed by December 2, 2025, with any responses due by December 9, 2025. The government will file several such motions.

## II.  STATEMENT OF THE CASE

Kevin Bell is charged with making a threat against the President, in violation of 18 U.S.C. § 871(a). Dkt. 37. Specifically, the one-count indictment alleges that, on about April 5, 2025, in the District of Maine, Bell knowingly and willfully made a threat to take the life of and to inflict bodily harm upon the President of the United States. *Id.*

The government's case-in-chief may include testimony from: Kenneth Tabor, the Investigator from the Maine Office of the State Fire Marshal to whom Bell stated the threat; two employees present at the Morning Glory Diner when Bell spoke to Tabor; Chief Jones of the Bridgton Police Department, to whom Bell spoke on April 7, 2025;

and one or more federal law enforcement officers who interviewed Bell on April 5, 2025, and/or transported Bell to jail on April 7, 2025. The government's case-in-chief may also include testimony from one or more federal or state law enforcement officers who interacted with Bell on about December 14, 2023.

The government may seek to admit in evidence, among other exhibits: a partial audio recording of Bell's encounter with Investigator Tabor on April 5, 2025; a video recording of Bell's encounter with Chief Jones on April 7, 2025; and a screen-capture from the Morning Glory Diner's camera of Bell and Investigator Tabor on April 5, 2025.

The government anticipates that the evidence will demonstrate as follows. On April 5, 2025, Investigator Tabor was off duty but "on call" and in standby status while eating lunch at the Morning Glory Diner in Bridgton, Maine. Investigator Tabor was in plain clothes and his Department of Public Safety vehicle—an unmarked pickup truck—was parked outside the Diner. Investigator Tabor was seated at the counter and could see his vehicle through the window. He observed a man—later identified as Bell—looking through the windows of his vehicle. Bell walked into the Diner and sat at the end of the counter, several seats down from Investigator Tabor. Bell asked a staff member who the vehicle belonged to. After learning the vehicle belonged to Investigator Tabor, Bell moved to sit closer to him and initiated a conversation.

The initial portion of Bell's conversation with Investigator Tabor was not recorded. The government anticipates testimony will show that Bell made statements to Investigator Tabor about his prior encounters with law enforcement, including making comments on social media that had resulted in encounters with the Secret Service and, more recently, the Federal Bureau of Investigation ("FBI"). Bell disclosed that he had been reported missing out of Missouri not long ago and was upset that the Cumberland

2

County Sheriff's Office located him in Naples. Bell also disclosed he had recently been detained by the Bridgton Police Department and taken to the hospital for an involuntary evaluation. He indicated that he took the Bridgton Police Department to small claims court because they lost his gloves during his detainment. Bell expressed dissatisfaction with law enforcement's ability to find him, asked about cellphone tracking and the Fourth Amendment, and spoke of his efforts to avoid detection through "burner phones," leaving his "burner phone" at home so he is harder to locate, and setting up a "VPN" to share comments online without being caught. He also disclosed buying older vehicles that do not have trackable components. Bell also talked about trying to avoid license plate readers and asked Investigator Tabor about their legality in Maine.

The government further anticipates the testimony will show that Bell disclosed that he does not like "Trump's FBI" but that he was not sure if "Biden's FBI" was any better. He said he hated President Bush the most, but he had not acted on his thoughts to kill President Bush. Bell felt President Trump was not much better. Bell stated, "I wanted to shoot Bush, but didn't, but now Trump is in and I don't care for him either," continuing to say either "I'll try to shoot him" or "I'll just shoot him." Bell then stated that he needs "to stop making comments about killing the President" and to stop talking about it because he was going to get himself in trouble.

Bell, who was a pilot, also spoke about hijacking commercial aircraft, telling Investigator Tabor that he "is able to take over a plane and crash it, hurting a lot more people," and expressing his surprise that he was still permitted to fly since he could easily fly undetected out of "Eastern Slopes"—located in Fryeburg—and do whatever he wanted, "like fly to D.C." Bell also indicated he has been diagnosed as being "on the spectrum" and that he is supposed to see someone clinically to talk about his statement

3

and ideations but has yet to do so.

During this conversation, Investigator Tabor contacted the Diner's owner via text, resulting in an employee—whom the government expects to call as a witness—photographing Bell's license plate in the parking lot. Investigator Tabor relayed the information to the Augusta Regional Communications Center ("RCC") and requested driver's license and registration information for the license plate. The RCC called Investigator Tabor and relayed that Bell was the owner of the vehicle. While speaking with Bell, Investigator Tabor also texted an FBI Special Agent to see if the FBI had been in contact with Bell. The Diner's owner provided Investigator Tabor with a screen-captured image from a security camera at the Diner.

Investigator Tabor began recording partway through his conversation with Bell. The government will seek to admit the audio recording in evidence and has prepared a proposed transcript of the recording, which is attached hereto as Exhibit A.[1] The audio recording began as Bell told Investigator Tabor about making statements at school board meetings. Exhibit A at 1. Investigator Tabor replied that he would not make any comments because they keep getting Bell in trouble. *Id.* Bell replied, "I think that's true in general. Everywhere, whether it's at a diner or in person, offline, anywhere, um, I think, I think that's, that's part of my, that's the problem. I'm starting to see it in my [unintelligible]." *Id.* When Investigator Tabor asked if he ever acted on his statements, Bell responded, "No, never." *Id.* Bell also stated, "but the saying them in itself is a problem too." *Id.* Investigator Tabor replied, "It certainly can be." *Id.* The remainder of

---

[1]     Government's Exhibit A and Exhibit B are proposed transcripts. Additional corrections or modifications may be made to the transcripts in advance of trial. The audio file associated with Exhibit A has a duration of fourteen minutes and four seconds. The video file associated with Exhibit B has a duration of thirty-nine minutes and sixteen seconds.

Bell's conversation with Investigator Tabor included, among other things, references to the attempted assassination of then-former President Trump at a rally and the shooting of the United Healthcare CEO. *Id.* at 2.

At the conclusion of the conversation, Investigator Tabor told Bell to stay out of trouble and "[d]on't act on any of those things." *Id.* at 6. Bell responded, "No. No. I think, um, uh, no, exactly. Don't act on it, don't even have the thoughts about it," to which Investigator Tabor responded, "Nope. That would be the best thing to do." *Id.*

The Diner employee who photographed Bell's license plate had previously interacted with Bell. A few weeks prior to the encounter with Investigator Tabor, Bell had been in the diner and talked to the employee about hurting people, stating that he did something bad to someone, they hurt him back, and he wants to hurt them back even worse. On April 5, 2025, the employee observed Bell move closer to Investigator Tabor after Bell learned he was a law enforcement officer, though the Diner employee only heard some of what Bell said. The Diner employee did not hear Bell threaten to kill President Trump.

The government anticipates that another Diner employee who was present on April 5, 2025, will testify at trial. That employee observed Bell enter the Diner and ask whose unmarked cruiser was outside. The employee joked to Investigator Tabor that he had been outed, at which point Bell moved closer and began speaking with Investigator Tabor. The employee did not hear much of the conversation—she tried to ignore it because it seemed strange. She heard Bell ask about the ability to tap a phone but did not hear Bell threaten to kill or harm President Trump or anyone else.

The government anticipates that either an FBI Special Agent or a Resident Agent in Charge with the United States Secret Service may testify that they interviewed Bell at

the Bridgton Police Department on April 5, 2025, following his arrest for a state offense (criminal threatening with a dangerous weapon). Though he denied threatening President Trump, Bell admitted going to the Morning Glory Diner on April 5, 2025, noticing the unmarked police vehicle outside, and asking staff about the vehicle. After learning the vehicle belonged to a law enforcement officer seated at the counter, Bell started a conversation with him. Bell disclosed he had been fired in January 2025 from his remote position as a software engineer for threatening to "put bugs in his code" and leak information should he ever acquire a security clearance. Bell also confirmed he has a pilot's license and claimed he had been "blue papered" (i.e. involuntarily committed) in December 2024 to Maine Medical Center in Sanford due to suicidal threats and in February 2025 to Spring Harbor Hospital for a crisis-line threat.

Bell was released on bail following his arrest for the state offense. On April 7, 2025, the Bridgton Police Department executed a state search warrant at Bell's residence and seized electronic devices and other items. On the same date, Bell went to the Bridgton Police Department and voluntarily spoke with Chief Jones. The conversation was video recorded. The government anticipates admitting the recording in evidence and has prepared a proposed transcript of the recording, which is attached hereto as Exhibit B. Bell was arrested on a federal warrant and complaint later that same day and was transported to the Cumberland County Jail by an FBI Special Agent and a Secret Service Special Agent. The transport was audio recorded and the government may seek to introduce the recording in evidence, if necessary.

Prior to April 5, 2025, Bell was known to the Secret Service, the FBI, and the Bridgton Police Department from various law enforcement contacts. In one such contact in December 2023, the FBI received a report of Bell posting a video about planning to

6

overdose on Zoloft during a flight to cause an emergency landing. Personnel from the FBI and the Bridgton Police Department contacted Bell on about December 14, 2023. The government does not intend to introduce evidence of the details of Bell's conduct leading to this encounter but intends to introduce evidence that law enforcement interacted with Bell on about December 14, 2023, and advised Bell that any further threatening statements may result in criminal charges.

## III.    ELEMENTS OF CHARGED OFFENSE

### A. The Elements

Bell is charged with knowingly and willfully making a threat to kill or inflict bodily harm upon the President of the United States. As relevant here, Title 18, United States Code, Section 871(a) criminalizes "knowingly and willfully" making "any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States." For the jury to find Bell guilty of this crime, the government must prove the following things beyond a reasonable doubt:

1)  First, that Bell said the words alleged to be the threat against the President;

2)  Second, that Bell understood and meant the words as a true threat; and

3)  Third. that Bell knowingly and willfully said the words.

*See* Pattern Jury Instructions of the Judicial Council of the United States Eleventh Judicial Circuit ("Eleventh Circuit Pattern Instruction"), Instruction O29 (Sept. 5, 2025 ed.), available at https://www.ca11.uscourts.gov/sites/default/ files/courtdocs/clk/FormCriminalPatternJuryInstructionsRevisedSEP2025.pdf; *see also* 18 U.S.C. § 871(a); Fifth Circuit Pattern Jury Instructions, Criminal Cases, Instruction 2.38 (2024 ed.), available at https://www.lb5.uscourts.gov/

viewer/?/juryinstructions/Fifth/PJI-CRIMINAL_2024_EDITION_FINAL.pdf;[2] Tenth

Circuit Criminal Pattern Jury Instructions, Instruction 2.36 (Feb. 7, 2025 ed.), available

at https://www.ca10.uscourts.gov/sites/ca10/files/documents/downloads/

2025%20Criminal%20Pattern%20Jury%20Instructions.pdf.[3]

### B. The government does not have to prove that Bell intended to carry out his threat.

"True threats" are not protected by the First Amendment. *Virginia v. Black,* 538

U.S. 343, 369 (2003) (*citing Watts v. United States,* 394 U.S. 705, 708 (1969)); *accord*

*Counterman v. Colorado,* 600 U.S. 66, 69, 74 (2023). A person who makes a true threat

"need not actually intend to carry out the threat." *Black,* 538 U.S. at 359-60. This is so

because "a prohibition on true threats 'protects individuals from the fear of violence' and

'from the disruption that fear engenders,' in addition to protecting people 'from the

possibility that the threatened violence will occur.'" *Id.* at 360 (*quoting Watts,* 394 U.S.

at 708) (cleaned up); *see also Counterman,* 600 U.S. at 74 ("True threats subject

individuals to fear of violence and to the many kinds of disruption that fear engenders."

(cleaned up and citation omitted)).

---

[2]    Fifth Circuit Pattern Jury Instruction 2.38 identifies the elements as: "*First*: That the defendant mailed [wrote] [said] the words alleged to be the threat against the President . . . as charged in the indictment; *Second:* That the defendant understood and meant the words mailed [written] [said] as a threat; and *Third:* That the defendant mailed [wrote] [said] the words knowingly and willfully, that is, intending them to be taken seriously." The instruction defines a "threat" as "a serious statement expressing an intention to kill, kidnap, or injure the President . . . which under the circumstances would cause apprehension in a reasonable person, as distinguished from words used as mere political argument, idle talk, exaggeration, or something said in a joking manner." *Id.*

[3]    Tenth Circuit Criminal Pattern Jury Instruction 2.36 identifies the elements as: "*First:* the defendant [mailed] [wrote] [said or uttered] the words alleged to be the threat against the [President] . . . as charged in the indictment; *Second:* the defendant understood and meant the words [mailed] [written] [said or uttered] as a threat; and *Third:* the defendant [mailed] [wrote] [said or uttered] the words knowingly and willfully." The instruction defines a "threat" as "a serious statement expressing an intention to kill, kidnap, or injure [the President] . . ., which under the circumstances would cause apprehension in a reasonable person, as distinguished from words used as mere political argument, idle talk, exaggeration, or something said in a joking manner."

This is no less true for threats against the President. As the Supreme Court observed, "[t]he Nation undoubtedly has a valid, even an overwhelming interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." *Watts,* 394 U.S. at 707 (citation omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (in an example explaining the Court's rationale regarding content discrimination in a city ordinance, acknowledging "the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President." (citation omitted)). Even threats made by an individual with no intention of carrying them out "may be costly and dangerous to society in a variety of ways . . . ." *Rogers v. United States,* 422 U.S. 35, 46-47 (1975) (Marshall, J., concurring). "Like a threat to blow up a building, a serious threat on the President's life is enormously disruptive and involves substantial costs to the Government. A threat made with no present intention of carrying it out may still restrict the President's movements and require a reaction from those charged with protecting the President." *Id.* at 47.

In a sentencing challenge to a conviction under 18 U.S.C. § 876, which criminalizes the knowing use of the mail to deliver a communication containing a threat to injure the addressee, the First Circuit noted that "showing that the perpetrator had an intention of seeing the threat through to fruition is not required." *United States v. Dixon,* 449 F.3d 194, 200 (1st Cir. 2006) (*citing United States v. Koski,* 424 F.3d 812, 817 (8th Cir. 2005)). The Seventh Circuit reached a similar conclusion for a defendant charged with threatening the President under Section 871(a), noting that "[a] true threat

does not require that the speaker intend to carry it out, or even that she have the capacity to do so." *United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017). *See also* Eleventh Circuit Pattern Instructions, Instruction O29 ("The Government doesn't have to prove that the Defendant intended to carry out the threat."); Fifth Circuit Pattern Jury Instruction, Criminal Cases, Instruction 2.38 ("It is not necessary to prove that the defendant actually intended to carry out the threat."); Tenth Circuit Criminal Pattern Jury Instructions, Instruction 2.36 ("If the defendant has raised the issue, the court should instruct the jury that it is not necessary to show the defendant intended to carry out the threat, nor is it necessary to prove the defendant actually had the apparent ability to carry out the threat. The question is whether those who hear or read the threat reasonably could consider that an actual threat has been made. The making of the threat with the requisite mental state, not the intention to carry it out, violates the law.").

Thus, Bell's intention—or even ability—to carry out his threat is not an element the government must prove at trial.

### C.  Defining "Threat" and "True Threat"

A "threat" is a statement expressing an intention to kill or inflict bodily harm upon the President. *See* Eleventh Circuit Pattern Instruction, Instruction O29. "True threats," which are not protected by the First Amendment, "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black,* 538 U.S. at 359 (*citing Watts,* 394 U.S. at 708; *R.A.V.,* 505 U.S. at 388); *see also Counterman*, 600 U.S. at 74. In the context of an alleged violation of 18 U.S.C. § 871(a), "a 'true threat' is a serious threat—not idle talk, a careless remark, or something said jokingly—that is made under circumstances that would lead a reasonable person to

believe that the defendant intended to kill or inflict bodily harm upon the President."
*See* Eleventh Circuit Pattern Instruction, Instruction O29 (cleaned up); *cf. United States v. Cantwell,* 64 F.4th 396, 402 (1st Cir. 2023) (defining "threat" for purposes of 18 U.S.C. § 875(b),(d) as "a communication that a reasonable recipient familiar with the context of the communication would find threatening."); Pattern Criminal Jury Instructions of the Seventh Circuit, Instruction 876(d) (2023 Ed.), available at https://juryinstruction.ca7.uscourts.gov/juryinstructions/instructions/criminal/Bauer_pattern_criminal_jury_instructions_2022updates.pdf (regarding 18 U.S.C. § 876(d)).

### D. Defining "Knowingly" and "Willfully"

The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident. *See* Eleventh Circuit Pattern Instruction, Instruction B9.1.A; *accord* Pattern Criminal Jury Instructions for the District Courts of the First Circuit, Instruction 2.15 (Feb. 6, 2024 ed.) ("knowingly" "means that the act was done voluntarily and intentionally and not because of mistake or accident").

The First Circuit recognizes that "[t]he statutory term 'willfully' is a chameleon, what the Supreme Court has called 'a word of many meanings whose construction is often dependent on the context in which it appears.'" *United States v. Marshall,* 753 F.3d 341, 345 (1st Cir. 2014) (*quoting Bryan v. United States,* 524 U.S. 184, 191 (1998)). Here, the government submits it would be appropriate to instruct the jury that "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. *See* Eleventh Circuit Pattern Instruction, Instruction B9.1.A; *see also* Pattern Criminal Jury Instructions for the District Courts of the First Circuit, Instruction 2.17 (Feb. 6, 2024 ed.) ("To act 'willfully' means to act voluntarily and intelligently and with

11

the specific intent that the underlying crime be committed—that is to say, with bad purpose, either to disobey or disregard the law—not to act by ignorance, accident or mistake."). While a person must have acted with the intent to do something the law forbids before they can be found to have acted "willfully," the person need not be aware of the specific law or rule that his conduct may be violating. *See* Eleventh Circuit Pattern Instruction, Instruction B91.A.

In contrast, the Seventh Circuit has rejected the argument that the term "knowingly and willfully" in 18 U.S.C. § 871(a) requires a defendant to know that their conduct is illegal. *Dutcher,* 851 F.3d at 763. That type of "heightened proof requirement," the Seventh Circuit held, "is typically limited to a narrow group of 'highly technical criminal statutes that present the danger of ensnaring individuals engaged in apparently innocent conduct.'" *Id.* (*quoting Bryan,* 524 U.S. at 194) (cleaned up). Looking to the *Elonis* Court's express rejection of the notion that 18 U.S.C. § 875(c) required the government to demonstrate he knew his conduct was illegal—and reliance on the maxim that "ignorance of the law is no excuse"—the Seventh Circuit concluded that Section 871(a) does not fall within the category of highly technical crimes requiring proof a defendant knew their conduct was illegal. *Id.* at 763. Thus, the Seventh Circuit affirmed an instruction that the defendant acted willfully "if he either actually intended his statement to be a true threat, or that he knew that other people reasonably would view his statement as a true threat but he made the statement anyway." *Id.* at 762.

To date, the First Circuit has not addressed the meaning of "willfully" as used in 18 U.S.C. § 871(a). Given the lack of binding precedent, in the specific circumstances of this case, the government believes it would be appropriate to include the "with the intent to do something the law forbids; that is, with the bad purpose to disobey or

disregard the law" language in the Court's willfulness instruction to the jury. Doing so would be consistent with the pattern jury instructions of several circuits with pattern instructions for 18 U.S.C. § 871(a).

### E. The government's proposed instructions are consistent with the Supreme Court's decisions in *Elonis v. United States* and *Counterman v. Colorado.*

In *Elonis v. United States,* 575 U.S. 723 (2015), the Supreme Court reversed a defendant's conviction under 18 U.S.C. § 875(c)—which does not specify a requisite mental state—because the jury was not required to find the defendant was aware of the threatening nature of his communication and was instead required to determine only whether he communicated what a reasonable person would regard as a threat. *Elonis*, 575 U.S. at 726, 732, 740. As a statutory matter, the Supreme Court held that the mental state requirement of 18 U.S.C. § 875 "is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," and that negligence is insufficient to support a conviction. *Id.* at 740-41.

In *Counterman v. Colorado,* 600 U.S. 66 (2023), the Supreme Court addressed a state stalking statute and a question left undecided in *Elonis*. The Court concluded that, for a criminal charge regarding a true threat, the First Amendment requires proof that the defendant had some subjective understanding of the threatening nature of his statements. *Counterman,* 600 U.S. at 69. The government must show "that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening . . . [and] need not prove any more demanding form of subjective intent to threaten another." *Id.*

Neither *Elonis* nor *Counterman* addressed the mental-state requirement in 18

U.S.C. § 871(a) which, on its face (and unlike 18 U.S.C. § 875(c)), requires a defendant to knowingly and willfully make the alleged threat. In any event, the Eleventh Circuit pattern jury instruction for 18 U.S.C. § 871(a)—which the government urges the Court to use in this case—"is unaltered by the Supreme Court's decision in *Elonis* . . . because in addition to the objective standard contained in the definition of 'true threat,' this instruction requires that the defendant's subjective mental state be considered." Eleventh Circuit Pattern Instruction, Instruction O29 note.

The Eleventh Circuit also explains that, although certain prior Eleventh Circuit cases that defined "true threat" were overruled post-*Elonis* for the failure to consider a defendant's subjective mental state, "the objective person standard remains useful in the determination of whether the defendant's statement actually constitutes a "true threat," as that term has been defined in prior case law." Eleventh Circuit Pattern Instruction, Instruction O29 note (*citing United States v. Martinez*, 736 F.3d 981, 984-86 (11th Cir. 2013), *overruled on other grounds*, 800 F.3d 1293 (11th Cir. Sept. 3, 2015)). This approach is consistent with *Counterman*'s observation that "[w]hether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat . . . ." *Counterman,* 600 U.S. at 74 (*citing Elonis,* 575 U.S. at 733). Whether a statement constitutes a threat "depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Id.* (*quoting Elonis,* 575 U.S. at 733).

## IV.    STIPULATIONS

The parties have not agreed on any stipulations.

## V.    POSSIBLE EVIDENTIARY AND TRIAL MANAGEMENT ISSUES

### A.  Audio Recordings and Transcripts

The government intends to offer in evidence the audio and video recordings discussed above. The government has prepared transcripts for each recording. The recordings are in the English language. The transcripts will be treated as an aid to the jury in following the recordings and the jury should be told that the recordings—not the transcripts—are the evidence. The government is proposing a jury instruction on this issue. *See* Pattern Criminal Jury Instructions for the District Courts of the First Circuit, Instruction 2.09 (Feb. 6, 2024 ed.).

### B.  Bell's Statements, Intrinsic Evidence, and/or Evidence of Other Crimes, Wrongs, or Acts under Rule 404(b)

Among other things, the government intends to introduce evidence of Bell's prior conduct and encounters with law enforcement in the form of (1) Bell's statements to Investigator Tabor on April 5, 2025, through testimony from Investigator Tabor and the partial audio recording of their encounter; and (2) Bell's statements to, and conversation with, Chief Jones on April 7, 2025, through Chief Jones's testimony and the video recording of their encounter.

The government will offer Bell's statements to Investigator Tabor and Chief Jones in its case-in-chief against Bell, a party opponent. Bell's statements about his prior conduct and encounters with law enforcement—as distinct from evidence regarding the prior conduct and encounters themselves—are not hearsay and are admissible pursuant to Federal Rule of Evidence 801(d)(2)(A). Bell initiated conversation with Investigator Tabor and chose to make statements about his prior conduct and encounters while stating his threat to the President. Bell chose to make statements about his prior conduct and encounters to Chief Jones in a conversation about Bell's alleged threat to the President, a conversation that Bell initiated. The relevance of Bell's statements does

not depend on Bell having actually committed the prior conduct or having experienced the prior encounters—it is his stated knowledge and recollection that serve as direct evidence of elements of the charged offense. His statements do not constitute evidence of prior crimes, wrongs, or acts under Federal Rule of Evidence 404(b).

Even if the Court concludes that Bell's statements are evidence of prior crimes, wrongs, or acts, the statements are admissible as "intrinsic" evidence of the charged crime. Intrinsic evidence "includes prior acts that are part of [the] necessary description of the events leading up to the crime[] or that go to an element of the charged offense." *United States v. Souza,* 749 F.3d 74, 84 (1st Cir. 2014) (*quoting United States v. Fazal-Ur-Raheman-Fazal,* 355 F.3d 40, 50 (1st Cir. 2004)) (internal quotations omitted); *see also United States v. Ramirez-Frechel*, 23 F.4th 69, 76 (1st Cir. 2022) ("Evidence of bad acts that are 'part of the charged crime' is admissible as 'intrinsic' evidence."). Intrinsic evidence is not governed by Rule 404(b) of the Federal Rules of Evidence. *Souza,* 749 F.3d at 84 n.2.

Drawing a line between "intrinsic" and "other acts" evidence requires a fact-specific inquiry and sometimes the same evidence can be admissible as either type. *United States v. Randazzo,* 80 F.3d 626, 630 (1st Cir. 1996) (opining that a "safe course" is to give a "general instruction that bad character is not a permissible inference."). Prior bad acts are generally "reasonably distinct (e.g. in time and place) from the crime charged in the indictment." *Id*. By contrast, intrinsic evidence is "more closely entangled with the events that comprise the charged offense." *Id*. For instance, "[u]ncharged acts [that] illuminate the chronology of events leading to the acts charged in an indictment, or that inform the jury concerning the circumstances surrounding the commission of the charged crime' are generally admissible." *United States v. Pina-Nieves*, 577 F. Supp. 3d

16

1, 4 (D.P.R. 2021) (*quoting* 1 Weinstein's Evidence Manual § 7.01 (2021)).

Here, Bell made statements about his prior conduct and law enforcement encounters to Investigator Tabor contemporaneous with threatening the President. Those statements are inextricably intertwined with and vital context for Bell's statement regarding the President—"I'll try to shoot him" or "I'll just shoot him." The statements bear directly on what Bell's statement regarding the President would convey to a recipient and, thus, directly on whether Bell made a true threat. Those statements also bear directly on Bell's understanding of, and intention behind, his statement.

"Where a statement may be ambiguous, the entire context, including the tone used, may assist the jury in determining whether that ambiguous statement was a threat." *United States v. Fulmer,* 108 F.3d 1486, 1495-96 (1st Cir. 1997) (*citing United States v. Malik,* 16 F.3d 45, 48 (2d Cir. 1994); *United States v. Sciolino,* 505 F.2d 586, 588 (2d Cir. 1974)); *cf. Watts,* 394 U.S. at 708 (observing that defendant's conduct could only be interpreted as a method of stating political opposition to the President when "[t]aken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners . . . ."). Bell's choice to approach an officer and threaten the President while describing his past thoughts, conduct, and encounters with law enforcement is precisely the type of context from which a jury could conclude that Bell's statement was a true threat and that Bell knowingly and willfully uttered that threat.[4]

---

[4]     Rule 403 of the Federal Rules of Evidence offers no barrier to the admission of Bell's statements. While evidence that a defendant "had engaged in other acts that might show he has a tendency to be violent or vengeful are prejudicial[, t]he question is whether this prejudice is unfair. In a threats prosecution, the general factual context in which the statement was made bears significantly on whether an ambiguous statement could reasonably be read as a threat." *Fulmer,* 108 F.3d at 1502. Given that Bell's threat was inextricably tied to, and communicated with, his statements about his prior conduct and encounters with law enforcement, admitting those statements is not unfairly prejudicial and any prejudice would not substantially outweigh their probative value.

Similarly, Bell's statements about his prior conduct and encounters with law enforcement to Chief Jones bear directly on Bell's understanding of, and intention behind, his threat against the President. His conversation with Chief Jones, occurring only two days after Bell made the charged threat, constitutes extrinsic commentary relevant to Bell's mental state when he made the threat. *See United States v. Oliver*, 19 F.4th 512, 518 (1st Cir. 2021). In *Oliver,* the First Circuit reviewed a conviction for violating 18 U.S.C. § 876(c) and looked to the defendant's statements in an interview after the threatening letters were received as relevant extrinsic commentary on the letters' ambiguous text. *Id*. The defendant's admission in that interview, the First Circuit held, "supplies evidence from which the jury reasonably could infer the defendant's awareness that the letter would be interpreted by the recipient as a threat of bodily injury." *Id*. (citation omitted).

So too here. Bell's statements to Chief Jones regarding his prior conduct and law enforcement encounters—along with Bell's varying denials of, and explanations for, his statements to Investigator Tabor—would permit the jury to conclude both that Bell's threat was a true threat and that he knowingly and willfully uttered the threat. Bell's denials to Chief Jones that he threatened the President do not undermine the relevance or admissibility of his other statements. A jury is not required to credit Bell's self-serving statements. *See Oliver,* 19 F.4th at 518 ("As a general matter, a criminal jury is entitled, within wide limits, to doubt a defendant's statements regarding his motives and to credit a plausible alternative motive suggested by the government." (citations omitted)). Bell's statements to Chief Jones corroborate other aspects of Investigator Tabor's anticipated testimony. His statements to Chief Jones also demonstrate Bell's attempts to evade responsibility for threatening the President, including claiming that:

Investigator Tabor was twisting his words and "downright framing" him; he was just telling Investigator Tabor about his recent encounters with the police; he was just "being stupid and like testing law enforcement;" and that Chief Jones and/or the Bridgton Police Department had taken him to Maine Med twice "and wanna teach him a lesson now," and have "some other vendettas about past things," including when he made threats against a psychiatrist. Exhibit B at 3-6, 9-11, 18. Because Bell's statements to Investigator Tabor and Chief Jones are "intrinsic" evidence that go directly to the "true threat" and "knowingly and willfully" elements of the charged crime are statements of a party opponent, they are admissible in the government's case-in-chief.

Even if Bell's statements to Investigator Tabor and Chief Jones are evaluated as evidence of other crimes, wrongs, or acts under Rule 404(b), they are not being offered as propensity evidence. Evidence of any other crime, wrong, or act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Bell's statements demonstrate his knowledge and intent in threatening the President, his knowledge and intention that the threat would be received as a threat, his knowledge of the unlawfulness of making a threat, and the absence of any mistake or accident in making the threat.

The government also intends to introduce evidence that Bell had an encounter with the Bridgton Police Department and the FBI in December 2023. While the government does not intend to introduce evidence of Bell's specific conduct leading to the encounter, it intends to introduce evidence that law enforcement warned Bell that any further threatening statements by Bell may result in criminal charges. To the extent the government will be required to demonstrate that Bell made his threat "with the

19

intent to do something the law forbids," the fact that he had previously been warned that making threatening statements may result in criminal charges is directly relevant to Bell's intent and knowledge. This evidence is admissible for the purpose of proving his intent, knowledge, absence of mistake, and lack of accident. *See* Fed. R. Evid. 404(b)(2).

Rule 404(b)(3) requires the prosecutor to: "(A) provide reasonable notice of any such evidence that the prosecutor intends to offer at trial . . .; (B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and (C) do so in writing before trial . . . ." The government provided written notice to Bell, through counsel, on November 24, 2025. The government's written notice is attached hereto as Exhibit C. The government will address the admissibility of Bell's statements further in a separate motion in limine.

## VI.    CONCLUSION

The government respectfully requests leave of the Court to supplement its trial brief between the time of filing and the time of trial to address any additional issues that may arise or if any matters discussed herein require further development.

Date: December 2, 2025                    Respectfully submitted,
                                          ANDREW B. BENSON
                                          United States Attorney

                                   BY:    */s/ Nicholas Heimbach*
                                          United States Attorney's Office
                                          100 Middle Street, East Tower, 6th Floor
                                          Portland, Maine 04101
                                          (207) 780-3257
                                          Nicholas.heimbach@usdoj.gov

                                          */s/ Shira Furman*
                                          United States Attorney's Office
                                          100 Middle Street, East Tower, 6th Floor
                                          Portland, Maine 04101
                                          (207) 780-3257
                                          Shira.furman@usdoj.gov

**CERTIFICATE OF SERVICE**

   I hereby certify that on December 2, 2025, I electronically filed the Government's Trial Brief with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Caleigh Milton, Esq., and Grainne Dunne, Esq.
Counsel for Defendant

         ANDREW B. BENSON
         United States Attorney

     BY:  */s/ Nicholas Heimbach*
         United States Attorney's Office
         100 Middle Street
         East Tower, 6th Floor
         Portland, Maine 04101
         (207) 780-3257
         Nicholas.heimbach@usdoj.gov